**SECOND DIVISION**
**MILLER, P. J.,**
**BROWN and GOSS, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 15, 2019**

# In the Court of Appeals of Georgia

A18A1975. MACON-BIBB COUNTY PLANNING AND ZONING    TB-078
COMMISSION et al. v. EPIC MIDSTREAM, LLC.

GOSS, Judge.

In this discretionary appeal, the Macon-Bibb County Planning and Zoning Commission ("the Commission") appeals from the superior court order reversing its denial of a conditional use permit for a railroad spur transfer station to unload ethanol into a pipeline. The Commission contends that the superior court erred in (1) failing to consider its answer to the certiorari petition; (2) failing to adhere to the deferential standard of review in a certiorari proceeding; and (3) issuing a final decision rather than remanding the case to the Commission for a new hearing. For the reasons that follow, we reverse.

"When reviewing a local governing body's zoning decision, the superior court applies the any evidence standard of review. In the appellate courts, the standard of review is whether there is any evidence supporting the decision of the local governing body, not whether there is any evidence supporting the decision of the superior court." (Citation and punctuation omitted.) *Bulloch County Bd. of Commrs. v. Williams*, 332 Ga. App. 815 (773 SE2d 37) (2015).

So viewed, the record shows that Epic Midstream, LLC, a handler of petroleum fuels, acquired roughly 80 acres of property ("the property") at the intersection of Barnes Ferry Road with Sofkee Road and the Norfolk Southern rail line in Bibb County. Some of the property was zoned M-1 Light Industrial ("M-1"),[1] but a portion was zoned Agricultural. Epic sought to have the entire property zoned M-1 and filed a rezoning application on February 4, 2015. The application was deferred numerous times before Epic was instructed to also apply for a conditional use permit, which it did on June 4, 2015. Both applications were subsequently withdrawn, and Epic then submitted new applications for rezoning and a conditional use permit. The application

_____

[1] Section 16.01 of the Comprehensive Land Development Resolution for the City of Macon and Bibb County provides that "[t]he M-1 district is intended for wholesale and light industrial uses where resultant noise, odors, pollution, and congestion are minimized. Residential development is prohibited. This district is not suitable for heavy industrial uses."

2

sought conditional use approval pursuant to Section 16.03 of the Comprehensive Land Development Resolution for the City of Macon and Bibb County, Georgia ("CLDR") to build and operate a railroad spur transfer station for the offloading of ethanol from railroad tanker cars directly into an underground pipeline which would transport the ethanol to Epic's petroleum distribution facility nearby.[2] A final hearing was held on Epic's applications on November 9, 2015, during which Epic presented testimony from its project director, the design firm's project manager, and a land planner.

During the hearing, the design manager testified that the rail cars carrying ethanol would be redirected from the Norfolk Southern rail line onto the rail spur, or "loop."[3] Sixteen train cars would be unloaded at a time, five times, for a total of 80 train cars at a time. The entire process would be completed within 24 hours, meaning it was likely that some of the process would take place during the night. Epic's project director testified that the unloading process would happen approximately once

_____

[2] The rail spur would connect to the already-existing Norfolk Southern rail line, on which ethanol is currently transported in train cars. The pipeline had not yet been built, but had been approved by the Georgia Department of Transportation and the Macon-Bibb County Engineering Department.

[3] We are unable to determine from the record the distance from the Northfolk Southern rail line to the rail spur at its farthest point from the rail line.

3

per month for a total of 13 unloadings per year. He further testified that the frequency could increase in the future based on contractual demands.

The land planner hired by Epic testified that there would be three access points to the property — two from Barnes Ferry Road and one from Sofkee Road. He explained that directly west of the property lies the main rail line, running parallel to Sofkee Road, and that the area further west is zoned M-2 Industrial, in which area a truck loading facility with above-ground tanks is located.[4] At the time of the hearing, the area to the northwest of the property and west of the rail line was vacant and mostly zoned M-1. A residential neighborhood was located to the north of the property, on the other side of Barnes Ferry Road, nested in between the property and an Industrial Park. The land to the east of the property was primarily undeveloped with some residences scattered along Barnes Ferry Road. A large farm was located directly southeast of the property while the area directly to the south was largely undeveloped and zoned Agricultural or M-1. Various industrial developments were located in the area southwest of the property, which was zoned M-1. The land planner

---

[4] Per the CLDR, "[t]he M-2 Heavy Industrial District is intended to provide appropriate locations for any use which may be obnoxious or offensive by reason of emission of odors, dust, smoke, gas, noise, or vibration. Residential uses are prohibited in this district."

testified that the region in which the property is located is "largely industrial," that the property is within close proximity to five industrial parks, and that the property is best suited to an industrial purpose. No homes had been built in the neighborhood abutting the property since 1991. According to him, this showed that this was not a "thriving" residential area, and the trajectory of the area did not point toward residential development. The land planner testified that the unloading area would be 320 feet from the nearest residential structure.

Three neighboring residents and a city council member spoke during the hearing as to the damage done to their properties by a jet-fuel pipeline leak that occurred in the 1980s in the same area, while the property was owned by NuStar Energy, LLC. Epic purchased the property as well as the jet-fuel pipeline from NuStar in 2012.[5] However, NuStar retained responsibility for the jet-fuel leak and its remediation.

Residents of the nearby neighborhood stated their opposition to the ethanol offloading station, citing their belief that their land was already "contaminated," that this development would further decrease their property values, and that another leak

---

[5] Epic planned to build a new pipeline to transport the ethanol using the existing right of way for the jet-fuel pipeline.

or spill would occur. Elaine Lucas, a member of the Macon-Bibb County Board of Commissioners (the "Board") and the Macon City Council representative for the nearby residents, believed that her constituents were suffering "environmental injustice" and still had no answers about the past jet-fuel pipeline leak.

The Commission granted Epic's application for rezoning, making the property M-1 in its entirety, but denied the application for a conditional use permit to operate the rail spur and ethanol facility. Following the Commission's denial of the permit application, Epic filed a motion for a rehearing on the matter pursuant to CLDR § 27.13.[6] As part of its motion, Epic submitted revised site development plans, in which the proposed transfer facility was moved to the southern end of the property at a

---

[6] Section 27.13 of the CLDR provides that any applicant

whose application has been denied by the Commission may, within thirty (30) days from the date of disapproval, file an application for a rehearing. All motions for a rehearing by the Commission shall be heard in the same manner as any other application and may be granted if new or additional written information or graphical information that was not available at the time of the original hearing, or was not presented for excusable neglect, is shown. Such information shall be submitted at the time the request for rehearing application is filed.

6

greater distance from the residential neighborhood to the north.[7] The revised plan also included additional engineering and safety controls, such as an earthen berm, which would serve as a containment device if any vapors were released and would run parallel to Barnes Ferry Road, providing an additional barrier between the residential neighborhood; additional fire hydrants; and a security fence to enclose the facility. Additionally, Epic communicated that it had met with a representative of the neighborhood and Elaine Lucas in an effort to coordinate a meeting with local residents to help alleviate their concerns and explain their new development plan.

Lucas again testified on behalf of the residents at the hearing on Epic's motion for rehearing, stating, "The major concern and the reason we don't want you to approve anything else is we are not sure of what's out there, what's in the ground. We are not sure the level of contamination. We are not sure whether any remediation has been done. . . ." She asked that the Commission defer or deny the motion "until we get some answers [on those issues]" and until the neighborhood could set up a

---

[7] In an email sent the month prior to the final hearing on Epic's applications, an urban planner for the Commission who was preparing the Commission staff report on the applications, asked Epic whether the transloading station could be "relocated to an area along the western property lines or to an area along the southern property lines." And if it could not, to "please explain."

meeting with the Georgia Environmental Protection Division. Some nearby residents again stated their opposition.

With the general consensus among the Commission being that nothing had changed and ethanol was still hazardous, the motion was denied on January 11, 2016.

Epic petitioned the superior court for certiorari pursuant to OCGA § 5-4-1 and Section 27.15 of the CLDR, arguing that it "met and exceeded every ascertainable and objective standard, criterion, term, condition and requirement necessary for issuance of the Permit as requested," and that it had "a clear legal right to issuance of the Conditional Use Permit[.]" After a hearing for oral argument, the superior court granted Epic's petition, concluding that the Commission grossly abused its discretion in denying Epic's application. The superior court reversed the Commission's decision and ordered that Epic's conditional use application be granted. The Commission subsequently filed an application for discretionary review, which this Court granted. This appeal followed. Additional facts adduced at the conditional use hearing before the Commission will be cited as necessary to consider the Commission's arguments.

1. In related enumerations of error, the Commission asserts that the superior court, applying judicial review by certiorari, erred because it weighed the evidence

presented before the Commission rather than applying the appropriate any evidence standard. We agree.

When reviewing a local governing body's zoning decision by writ of certiorari, "[t]he scope of review is limited to all errors of law and determination as to whether the judgment or ruling below was sustained by substantial evidence." OCGA § 5-4-12 (b). "Substantial evidence" under this section has been consistently interpreted to mean "any evidence." *City of Atlanta Government v. Smith*, 228 Ga. App. 864, 865 (1) (493 SE2d 51) (1997). Thus, in order to reverse the judgment of the Commission, the superior court must conclude that the record below lacked "any" evidence to support the Commission's decision. *Jackson County v. Earth Resources, Inc.*, 280 Ga. 389 (627 SE2d 569) (2006). This Court's "standard of review is whether there is any evidence supporting the decision of the local governing body, not whether there is any evidence supporting the decision of the superior court." (Citation and punctuation omitted.) Id.

> Neither the superior court nor this Court reweighs credibility determinations of the factfinder. In other words, because the factfinder in the initial proceedings is charged with weighing the evidence and judging the credibility of the witnesses, the superior court and this Court must view the evidence in the light most favorable to the factfinder's decision and must affirm the decision if there is *any evidence* to support

9

it, even when the party challenging the factfinder's conclusions presented evidence during the initial proceedings that conflicted with those conclusions.

(Citations omitted.) *Dekalb County v. Bull*, 295 Ga. App. 551, 552-553 (1) (672 SE2d 500) (2009).[8]

Section 303 (2) of the CLDR contains standards to be considered by the Commission, where applicable, in an application for a conditional use permit. Those standards, in pertinent part, are:

(a) The existing land use pattern. . . .

(d) Whether the proposed use will be of such location, size, and character that, in general, it will be in harmony with the appropriate and orderly development of the area in which it is proposed to be situated and will not be detrimental to the orderly development of adjacent properties or a deterrent to the improvement of adjacent properties in accordance with the zoning classification of such properties, the existing land use pattern, or the comprehensive land development plan.

(e) Whether, in the case of any use located in, or directly adjacent to, a residential district or area:

---

[8] See also OCGA § 5-4-15 (b) (when reviewing a lower tribunal's ruling on writ of certiorari, the superior court may only issue a final decision "if there is no question of fact involved which makes it necessary to send the case back for a new hearing before the tribunal below").

10

(i) The nature and intensity of operations will be such that both pedestrian and vehicular traffic to and from the use and the assembly of persons in connection therewith will not be hazardous or inconvenient to, or incongruous with, said residential district or area, or conflict with the normal traffic of the neighborhood; and

(ii) The location and height of buildings, and other structures, and the nature and extent of screening, buffering or landscaping on the site will be such that the use will not hinder or discourage the appropriate development and use of adjacent land and buildings in conformance with existing zoning districts and development pattern.

(f) Whether the proposed use will increase the population density resulting in the increase or overtaxing of the load on public facilities such as schools, utilities, streets, etc.; or approval of the use would encourage adjacent areas to develop at higher densities than provided in the comprehensive plan resulting in the overtaxing of such public facilities.

(g) Whether the proposed use will cause a health hazard, a public safety problem, or nuisance created or excessively increasing traffic and associated congestion; creating a drainage problem; generating unnecessary disturbances due to noise, the emittance of smoke or other contaminants, odor, electrical interference or causing pollution to land, air and/or water.

(h) Whether the proposed change will adversely affect property values in adjacent areas. . . . .

As detailed below, there was evidence presented before the Commission from which it could deny Epic's request for a conditional use permit under the standards set forth in Section 302 (2) of the CLDR. Notably, there was a written petition in the

11

record before the Commission signed by nearly one hundred area residents opposing the related re-zoning application to allow the construction of the rail spur line and development of a renewable energy rail-to-pipeline loading station. This petition raised concerns about the flammable nature of the ethanol, concerns that the pipeline would devalue their property, and traffic and noise issues. The petitions also noted concerns about the hazardous nature of ethanol, and concerns regarding the potential for spills during the unloading process. Further, at the conditional use application hearing, a city council member and three area residents spoke in opposition, outlining additional specific concerns about prior contamination by a fuel pipeline leak in the area which required capping of area water wells. Reverend Arthur Hubbard, a pastor of a nearby church, explained that his church and community had been at that location for over a hundred and twenty years, before industrial uses moved into the area. He explained that his property and the property of his neighbors had already been contaminated and devalued by the prior jet fuel spill. Commissioner Lucas noted that the Macon-Bibb County Commission sent a letter to the Planning and Zoning Commission, asking it to defer the decision until residents could have a community meeting with the State of Georgia Environmental Protection Division. Another speaker brought evidence of a prior derailment of train cars carrying ethanol in

12

another state to demonstrate that their fears regarding the potential for a spill or contamination were not unwarranted.

In October 2015, after Epic's initial application for re-zoning, ethanol was designated as a hazardous liquid by the Pipeline Hazardous Materials Safety Administration ("PHMSA") and the Federal Railway Administration. See 49 C. F. R. §195.2 ("Hazardous liquid means . . . ethanol"); 49 U. S. C. A. §60101 (a) (4) (C) ("'hazardous liquid' means . . . a substance that the Secretary of Transportation decides may pose an unreasonable risk of life or property when transported by a hazardous liquid pipeline facility in a liquid state"). After these changes were presented to the Commission, the planning report noted that "in light of the additional information regarding ethanol and its dangers to public health and welfare, staff has concerns that this proposed development will pose significant negative impacts to the adjoining and nearby properties." Further, the planning report stated that the re-zoning would cause "negative impacts as light and noise from the rail cars and diesel locomotives that could affect adjacent properties" as well as concerns that ethanol is a "hazardous and flammable liquid that could pose a danger to the adjacent residents in the event of a derailment, spill, or fire." During the hearing, Epic was unable to confirm that the trains that would be transporting the ethanol would be retrofitted to

comply with the newest regulations applying to the transportation of ethanol. Epic also responded to questions by concerned neighbors, and explained that although it would do its best to unload the pipeline during business hours, it was unable to guarantee that it would not happen at night.

In reversing the Commission's denial of the special use permit, the superior court's order cites to assurances by Epic that the chances of an accident or spill were low and that the operation was designed so as to avoid pollution to the area "land, air or water on or off property." The order notes that the superior court took

> notice of the fear the community holds and the hardships it has endured in the past. . . Yet, the issue at hand must be determined on more than fear alone. As stated above, generalized fears do not rise to the level of any evidence. The [c]ourt recognizes that the fear is real, but the evidence in opposition does not support any reasonable likelihood or probability of incident. The only evidence reflects a highly regulated process to ensure the proper handling of a substance . . . Therefore, the Court sees no evidence to the degree necessary to support a denial of the application[.]

Unlike the generalized concerns voiced about landfills in *Fulton County v. Bartenfield*, 257 Ga. 766 (363 SE2d 555) (1988), there were specific issues raised during the hearing about noise, traffic, possible contamination, and the flammability

14

and hazardous nature of ethanol that were specific to this tract and conditional use application. See *Jackson County*, 280 Ga. at 391 (finding that the local zoning board had evidence before it from which to deny a special use permit when, inter alia, residents raised specific concerns about the proposal to create a landfill in the area). There was record evidence before the Commission to support its decision to deny the conditional use application. The superior court's order acknowledges this evidence, but then weighs evidence in the record to conclude that there was "no evidence to the degree necessary to support a denial of the application based on the above standard." "It is not the law that only expert opinions could be presented to, and considered by, the Board, nor is the superior court to weigh the evidence before it; the question is whether there was *any evidence* before the Board to support its decision." *Jackson County,* supra. As the record supported the Commission's decision to deny the conditional use permit, the superior court erred in ordering the Board to issue it.

2. As a result of our holding in Division 1, the Commission's remaining enumerations of error are moot.

*Judgment reversed. Miller, P. J., concurs and Brown, J. dissents.**

**\*THIS OPINION IS PHYSICAL PRECEDENT ONLY, COURT OF APPEALS RULE 33.2(a).**

15

A18A1975. MACON-BIBB COUNTY PLANNING AND ZONING

COMMISSION et al. v. EPIC MIDSTREAM, LLC.

BROWN, Judge, dissenting.

I respectfully dissent. To accept the majority's interpretation of "any evidence" is to accept any modicum of speculative fear or unsubstantiated and misplaced blame as reasonable cause to deny an appropriate use of private property.

At the outset, it is important to recall that the conditional use application before the Commission was not for an ethanol pipeline. As the majority notes in passing in a footnote, Epic already had obtained the approval of the Georgia Department of Transportation and the Macon-Bibb County Engineering Department for the ethanol pipeline right of way. Thus, regardless of whether the Commission approved or denied the conditional use application before it, Epic could build the ethanol pipeline along Barnes Ferry Road and the neighborhood. And regardless of whether the Commission approved or denied the application before it, the Norfolk Southern main rail line would continue to run adjacent to the neighborhood, already carrying hazardous substances such as ethanol.

Our Supreme Court has "previously ruled that in Georgia the substantial-evidence standard is effectively the same as the any-evidence standard .

. . which shall mean that the record does not contain such relevant evidence as a reasonable mind might accept as adequate to support said decision." (Citations and punctuation omitted.) *Emory Univ. v. Levitas*, 260 Ga. 894, 897 (1) (401 SE2d 691) (1991). See also *City of Atlanta Govt. v. Smith*, 228 Ga. App. 864, 865 (1) (493 SE2d 51) (1997) (overruling cases to the extent they recognize a difference between the any evidence and substantial evidence standards and recognizing that the appropriate standard of review to be applied to issues of fact on writ of certiorari is whether the decision is supported by any evidence).

The majority omits important details from the record in order to downplay the fact that the 1980s jet-fuel pipeline leak, an incident wholly unrelated to the application, and the affected residents' discontent with NuStar, an entity wholly unrelated to Epic, were at the core of the opposition to Epic's application. For instance, at the final hearing, one resident voiced that "the big issue" was that "[NuStar] . . . left a leaking pipeline that has not been cleaned up . . . [NuStar has] contaminated the area, and they have not remediated it." During the hearing regarding Epic's motion for rehearing, one resident testified as follows:

> the last time the Commission voted on this, it was unanimous because — not because it was not the right place for it, but because this community has already been super scarred. . . . I'm angry that [Epic]

2

would even come back to y'all and ask to put it in the same spot. The contamination is there. . . . We really, really, really need for Epic and NuStar to take responsibility for what's out there now, clean it up and maybe in ten, 15 years when that community is clean, then they can resubmit. . . ."

In denying Epic's application, one member of the Commission stated,

there will be negative impacts such as light and noise from the rail cars and locomotives that could affect adjacent properties. Additionally, there is the aspect of ethanol being a hazardous and flammable liquid that could pose dangers to the adjacent residents in the event of a derailment, spill, or fire. To me, that's the issue, especially for this neighborhood. . . . [B]ecause of this neighborhood and some of the things that it's been through and some of the things that they're still trying to figure out, I don't feel comfortable approving [the conditional use application].

The Chairman of the Commission echoed this sentiment, stating "I understand this operation between the 1984 spill and what's going on right now. I know they are two separate issues. But fear is common here. And another opportunity for – for any kind of tragedy is – it's very obvious here. . . ."

The majority's attempt to distinguish the instant case from *Fulton County v. Bartenfeld*, 257 Ga. 766, 770 (3) (363 SE2d 555) (1988), by pointing to the "specific issues raised" here is to no avail. For instance, the majority highlights traffic as a

3

specific issue raised by a citizen during the final hearing to support the Commission's decision. However, the planning report specifically noted that the traffic impact to Barnes Ferry Road would be minimal based on the limited development proposed. In reaching this conclusion, the planning staff requested input from the Macon-Bibb County Traffic Engineering Department, which had "no traffic issues with the proposal."[1] As our Supreme Court explained in *Bartenfeld*, supra, "opposition [based] upon . . . generalized fear, not specifically shown to exist under the facts of this case, [is] insufficient" to rise to the level of any evidence. Id. at 770 (3). Following the majority's line of reasoning leads to the conclusion that *specific*, unsubstantiated fears somehow hold more weight than *general*, unsubstantiated fears. Regardless of how narrowly the fear or issue is framed, if it still is "not specifically shown to exist under the *facts* of the case," it does not rise to the level of any evidence. (Emphasis supplied.) Id. (hearing testimony in opposition to development regarding generalized fear that landfills lower property values and create traffic problems insufficient

---

[1] The issue of traffic was raised in a petition opposing the proposed development submitted to the Commission. The majority neglects to point out that the record also contains a second written petition signed by local residents *supporting* the proposed development. Simply put, these rival petitions show public opposition to *and* support of the proposed development, both grounded on generalized points of view rather than facts supported by evidence.

evidence). Compare *Jackson County v. Earth Resources, Inc.*, 280 Ga. 389, 391 (627 SE2d 569) (2006) (land planning staff's conclusion that landfill would be inconsistent with the Comprehensive Land Use Plan, certified real estate appraiser's opinion that the landfill would negatively affect surrounding property values, and testimony of nearby towns' officials regarding the negative impact of truck traffic amounted to more than generalized fears concerning landfills and supported zoning body's denial of special use permit);[2] *Fulton County v. Congregation of Anshei Chesed*, 275 Ga. 856, 858-859 (2) (572 SE2d 530) (2002) (evidence that the introduction of similar "institutional uses" in a neighborhood across the street had led to increased density development, threatening "the stability of the neighborhood," was sufficient to support the zoning body's decision to deny a conditional use permit for a place of worship within a single-family residential neighborhood), disapproved of on other grounds by *City of Cumming v. Flowers*, 300 Ga. 820 (797 SE2d 846) (2017).

The majority offers that "the planning report stated that the re-zoning would cause 'negative impacts' [such] as light and noise from the rail cars and diesel

---

[2] By contrast, here, the planning staff report concluded that the proposed development would not have an adverse effect on the comprehensive land development plan and that there was "no evidence provided that [the proposed] development [would] adversely affect[] property values in adjacent areas."

locomotives'" to support its foregone conclusion that the proposed development would negatively impact adjacent properties. However, the planning report states that these were negative impacts that *"could* affect adjacent properties." (Emphasis supplied.) Furthermore, the planning report, after identifying these potential negative impacts, went on to outline the various remedial measures Epic proposed to counteract the possibility of these impacts, including that the development would include a 100-foot undisturbed tree buffer, providing a vertical screen as well as horizontal separation from the residences on the opposite side of Barnes Ferry Road. The staff also explained that Epic had designed the transfer facility as a loop such that rail cars would not be uncoupled and recoupled to transfer the ethanol, thus limiting the process's noise. During the final hearing, Epic presented testimony from its land planner that the only noise would come from the train cars traveling on the loop and the transfer process, which would only occur around once per month. According to him, the noise generated from the unloading would be less than the noise already generated by the main rail line and two nearby airports. The design project manager testified that the transfer facility would utilize electrical pumps, making the process "relatively quiet" and that the "loop" design, such that train cars would not have to uncouple and recouple, would further reduce noise. He also explained at the hearing

6

that the lighting for the transfer area would be concentrated at the "loop" and "directional," meaning it would be pointed down toward the operational area. The record is devoid of any evidence that despite those measures there would still be "negative impacts" from light or noise. Compare *City of Roswell v. Fellowship Christian School, Inc.*, 281 Ga. 767-768 (1) (642 SE2d 824) (2007) (zoning body was authorized to deny permit for high school stadium when applicant's own evidence showed that the stadium would add to the already existing adverse traffic conditions in the area due to two other stadiums within one mile, and no practical remedial measures could be taken to counteract that negative consequence).

The majority also points to the planning report's note "that ethanol is a 'hazardous and flammable liquid that could pose a danger to the adjacent residents

in the event of a derailment, spill, or fire.'"[3] Again, the majority omits that the planning report goes on to consider the proposed remedial measures:

> [Epic] must maintain compliance with several federal and state requirements that are designed to mitigate potential dangers associated with the transfer of ethanol liquid. . . . The applicant has outlined a plan to mitigate negative impacts to the nearby property owners including the possibility of relocating the ethanol transfer station to a different area of the site [with a greater distance from residences].

The record shows that Epic provided the Commission with its work instructions and safety checklist to be completed each time a transfer occurred, a detailed outline of operational procedures, and a summary of the proposed spill containment system for the facility, including the applicable regulations. During the final hearing, the design

---

[3] In its initial report on Epic's *re-zoning* application, the planning report recommended granting Epic's request to re-zone. However, the planning staff later issued an amended report based on information regarding ethanol that had since come to light. According to the report, the Pipeline and Hazardous Materials Safety Administration (PHMSA) added ethanol to its definition of "hazardous liquids" in March of 2015, meaning PHMSA had determined that ethanol was a substance which "*may* pose an unreasonable risk to life or property when transported by a hazardous liquid pipeline facility in a liquid state" pursuant to 49 U.S.C. § 60101 (a) (4) (B). (Emphasis supplied.) PHMSA's decision was based on the projected increase in biofuels demand; the belief that pipeline transportation was a more efficient mode of transportation with a consistently lower accident rate than other modes of transportation; and the need for uniform oversight and consistent regulation of energy liquids by PHMSA. Despite this new information, the planning staff did not recommend denying the request to re-zone.

8

project manager, an engineer, testified that the facility would have a containment area — regulated by federal, state, and county guidelines — where any drips or spills would be captured. When questioned by the Commission, he also explained that no vapors or fumes would escape during the process because it is a "closed system," meaning the ethanol is "suck[ed]" out of the train car while air is pumped into the car. Again, no specific evidence was offered to rebut this testimony apart from vocalized and unsubstantiated concerns of "human error[]."

In sum, the opposition to the conditional use application was based almost wholly upon the prior NuStar jet-fuel pipeline leak which occurred over 30 years ago along with the affected residents' dissatisfaction with the remediation process and the perceived lack of communication about that spill.[4] Because I believe the superior

---

[4] NuStar held a meeting with some of the affected residents in May of 2015 to explain the remediation efforts and the progress that had been made. An official from the Georgia Department of Public Health sent a memorandum dated June 2, 2015, to the Macon-Bibb County Environmental Health Manager after "a resident of Barnes Ferry Road raised concerns of the proposed Epic . . . Ethanol transfer rail spur rezoning. . . ." The memorandum clarified that "[t]he past [jet-fuel] incident and its cleanup is [a] separate issue from the proposed rail spur," and included a summary of the jet-fuel pipeline leak and the remediation efforts. The memorandum explained that Epic had submitted a required safety plan to the PHMSA which covered safety protocol for staff training, equipment, and procedures on how to respond to emergency situations. Additionally, the memorandum set forth general information about ethanol, including that ethanol rapidly biodegrades in soil and water; any released ethanol vapor disperses rapidly; and "[f]rom a toxicity and environmental

court clearly grappled with an emotionally charged issue and properly concluded that no evidence supported the Commission's decision under the appropriate standard of review, I respectfully dissent.

standpoint, denatured fuel grade Ethanol is a safer alternative to the 50/50 mix of gasoline and kerosene that comprised [the jet-fuel pipeline leak]." The land planner's report echoes this, citing a portion of a class given to firefighters on ethanol as follows: "Ethanol is less toxic than gasoline or methanol. Carcinogenic compounds are not present in pure ethanol."